# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

|                              |   |                              |
|------------------------------|---|------------------------------|
| **RICKARD HARLEY SCRUGGS,**  | : |                              |
|                              | : |                              |
| Plaintiff,                   | : |                              |
|                              | : |                              |
| v.                           | : | Civil Action No. 7:05-cv-95(HL) |
|                              | : |                              |
| **ALLEN LEE, Deputy, WINSTON C.** | : |                          |
| **PETERSON, Sheriff, et al.,** | : |                            |
|                              | : |                              |
| Defendants.                  | : |                              |

_____

## ORDER

This is an action brought as the result of a stop at a highway roadblock.  All parties to the action have moved for summary judgment.  After reviewing the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, the Court finds that Defendants are entitled to judgment as a matter of law as to the federal claims against them.

## I.       FINDINGS

After review of the evidence, the Court makes the following findings.  Additional findings will be added in other sections of this Order, as necessary to those determinations.

On November 26, 2003, Rickard Scruggs was driving an automobile south on U.S. Highway 441 in Clinch County, Georgia.  Scruggs was accompanied in the car by his friend of thirty years, Kim Brown.  At the intersection of U.S. Highway 441 with Georgia Highway 122, Scruggs and Brown encountered a law enforcement roadblock.  The roadblock was being operated in conjunction with a "Click-It-or Ticket" Campaign conducted by the Clinch County

Sheriff's Office.  In addition to the Clinch County Sheriff's Department deputies who were present, law enforcement officials from the Georgia Department of Corrections and the Georgia Department of Natural Resources were assisting with the roadblock.  There were also canine units at the scene which were being used to detect for illegal drugs.

Scruggs was obliged to stop his vehicle when he neared the roadblock.  Clinch County Sheriff's Deputy Allen Lee was the first officer to approach the vehicle.  Deputy Lee asked Scruggs to produce a driver's license and proof of insurance.  Before Scruggs could produce the requested information, one of the canine units appeared at the driver's side window.[1]  Deputy Lee immediately directed Scruggs to pull his car to the side of the road, which he did.  After Scruggs' vehicle was pulled to the side of the road, Officer James Greene of the Georgia Department of Corrections walked a canine unit around the vehicle; the dog alerted.[2]  Following the dog's alert, Officer Greene asked Scruggs to exit the vehicle.  Scruggs walked to the front of the vehicle where he waited with Deputy Lee.  Plaintiff's passenger, Kim Brown, was also

---

[1] Some of the events following the stop of the vehicle are in dispute.  The Investigative Narrative prepared by Deputy Lee, which is the only evidence showing Deputy Lee's version of events, indicates that Scruggs could not immediately produce the requested items and was then directed to pull over to the side of the road.  Scruggs contends, however, that he was getting the necessary items together even before Deputy Lee approached the vehicle, but did not even have the opportunity to produce the requested items before the dog appeared.  (Scruggs Dep. at 25-27.)

[2] Greene's testimony as to the events is a little unclear.  Scruggs asked Greene about the stop and about the level of traffic on the road at the time and then asks, "At this point, you walked a narcotics dog around the vehicle."  Greene responds affirmatively, but it is not clear from the question whether "this point" was while Scruggs' car was on the road, or whether it was after the car had been pulled to the side of the road.  (Greene Dep. at 27-28.)

asked to exit the vehicle.[3]

As Brown was exiting the vehicle, Deputy Lee observed her attempting to conceal a clear plastic bag containing a green leafy substance with her hand. A search of the vehicle revealed marijuana in Scruggs' car. Scruggs was then placed in handcuffs and he and Brown were put in the same police vehicle and transported to the Clinch County jail by Deputy Howell. Brown posted bond and was released from jail the same day. Believing that he was entitled to have a judge determine whether he should be detained, Plaintiff refused to participate in the booking process. Plaintiff remained in the Clinch County jail until November 29, 2003. On that date, he met with Clinch County Magistrate Judge Linda Brown. That same day, Plaintiff posted bond and was released. He later pled nolo contendere to a misdemeanor charge of possession of marijuana.

On November 23, 2004, Scruggs filed the complaint at issue here.[4] Scruggs named the following persons as Defendants: Clinch County Sheriff's Officers Allen Lee,[5] Ferrell Howell,

---

[3] The Investigative Narrative prepared by Deputy Lee states that Officer John D. Bass, III, of the Georgia Department of Corrections asked Brown to exit the vehicle. (Bass Dep., Ex. 2.) Officer Bass denies that he asked Brown to step out. He believes that Jason Wilson, also with the Georgia Department of Corrections, may have made the request. (Bass Dep. at 31.)

[4] The complaint was originally filed in the United States District Court for the Southern District of Georgia but was transferred to this Court on August 25, 2005.

[5] At the time of the incident giving rise to this lawsuit, Allen Lee was a Deputy with the Clinch County Sheriff's Office. Lee died during the pendency of this action. Defendants filed a Suggestion of Death on January 11, 2005. (Doc. 27, Ex. 5, pg. 3.) The certificate of service attached to the Suggestion of Death shows that Plaintiff was served with notice of Lee's death. Scruggs acknowledged receiving a copy of the Suggestion of Death. (Scruggs Dep. at 16.) Having been served with notice of Lee's death, Scruggs then had the right to file a motion for substitution. No such motion appears in the record and more than 90 days have passed since the Suggestion of Death was placed in the record. Therefore, this case is dismissed as to Defendant Allen Lee. *See* Fed. R. Civ. P. 25(a).

and Raymond Peterson, in their individual and official capacities; Clinch County Sheriff Winston C. Peterson, in his official capacity; Department of Corrections Officers James Greene and John T. Bass, in their individual capacities[6]; Department of Natural Resources Officer Gary Simmons[7]; Chief Magistrate Judge Annie Ruth Steedley, in her official capacity; and Magistrate Judge Linda Brown, in her individual and official capacities.  Scruggs also "nominally" sued the following members of the Clinch County Commission:  John Strickland, Barry Hart, Herman Corbett, Rhonda Cross-Scott, and Milton Smith.[8]

Scruggs alleges federal claims under 42 U.S.C. §§ 1983, 1985, 1986, and 1988, as well as state law claims.  Specifically, he has alleged six causes of action in his complaint: (1) violation of his Fourth Amendment right to be secure against unreasonable searches and seizures when he was seized without a warrant and without probable cause; (2) violation of his Fourteenth Amendment right not to be deprived of liberty or property without due process of law when he was seized without a warrant, denied bail and denied a hearing; (3) false imprisonment; (4) violation of his Fourteenth Amendment right not to be deprived of liberty or property and not to be denied equal protection of the law when he was seized and held; (5) denial of due process protections afforded by the Constitution of the State of Georgia; and

---

[6] Defendant John T. Bass was dismissed by stipulation on December 9, 2005.

[7] Defendant Gary Simmons was dismissed by stipulation on December 9, 2005.

[8] Scruggs also named a John Doe Defendant.  Scruggs contends he knows who the John Doe Defendant is but does not intend to pursue claims against him.  (Scruggs Dep. at 99.)  Scruggs has never moved to amend the pleadings to identify the John Doe Defendant.  Accordingly any claims brought against the John Doe Defendant are hereby dismissed.

4

(6) violation of his due process rights  under the Constitution of the United States and the Constitution of the State of Georgia.

## II.    CONCLUSIONS OF LAW

Following discovery, on December 8, 2005, the Clinch County Defendants–Winston Peterson, Ferrell Howell, Raymond Peterson, Linda Brown, Annie Ruth Steedley, and the members of the Clinch County Commission–filed a Motion for Summary Judgment [doc. 29]. These Defendants seek judgment as a matter of law as to all claims brought against them. Thereafter, on December 23, 2005, Defendant James Greene filed a Motion for Summary Judgment [doc. 38].  Plaintiff then filed his own Motion for Summary Judgment on January 18, 2006 [doc 65].  The Court will address below the liability of the various Defendants.

### A.    SECTION 1983 CLAIMS

#### 1.    The Clinch County Commissioners

In his complaint, Scruggs states, "Defendants John Strickland, Barry Hart, Herman Corbett, Rhonda Cross-Scott, and Milton Smith are being sued nominally." (Compl. ¶ 13.) The complaint contains no other allegations against these Defendants.  When asked about his decision to name the Commissioners in the complaint, Scruggs explained that his purpose was to name them in order to name Clinch County, Georgia, as a Defendant.  (Scruggs Dep. at 63-64.)  Scruggs conceded that it was not his contention that any of the individual Commissioners did anything wrong, and further conceded that he was not sure what role the Clinch County Commission had with regard to the operation of the Clinch County Sheriff's Office.  (Scruggs Dep. at 64.)

The County Commissioners maintain that in the absence of any showing by Scruggs as to some conduct or some policy of the Commissioners giving rise to a violation of his federal rights they are entitled to judgment as a matter of law as to any § 1983 claims against them.  The Court agrees.

A county is liable under § 1983 only for acts for which the county is actually responsible. Marsh v. Butler County, 268 F.3d 1014, 1027 (11th Cir. 2001) (*en banc*).  "In Georgia, a county has no authority and control over the sheriff's law enforcement function."  Grech v. Clayton County, Ga., 335 F.3d 1326, 1347 (11th Cir. 2003).  Rather, a sheriff "acts on behalf of the State in his function as a law enforcement officer and keeper of the peace in general."  Id.

As the foregoing authorities suggest, liability for the conduct of the Clinch County Sheriff or his officers may not be imposed on the Clinch County Commissioners merely because of their role as the decision making body for the County.   Furthermore, "[a] county's liability under § 1983 may not be based on the doctrine of respondeat superior."  Id. at 1329.  Instead, to impose liability on the Clinch County Commissioners, Scruggs must identify a municipal policy or custom adopted by the County Commissioners that resulted in a constitutional violation.  Id.  Scruggs has failed to identify such a municipal policy or custom.  Accordingly, he cannot maintain a claim against the Clinch County Commissioners.  Therefore, the Clinch County Commissioners–John Strickland, Barry Hart, Herman Corbett, Rhonda Cross-Scott, and Milton Smith–are entitled to judgment as a matter of law as to the § 1983 claims against them.

### 2.	Sheriff Winston C. Peterson

Scruggs sued Winston C. Peterson in his official capacity as Sheriff of Clinch

County, Georgia.  (Compl. ¶ 7.)  Scruggs contends that Peterson "failed in his duty to properly train and supervise the actions of his deputies" and that the failure to train "was the proximate cause of the unlawful seizure of Scruggs, and was a proximate cause of Scruggs' imprisonment without due process of law."  (Compl. ¶¶ 56-57.)  Sheriff Peterson contends that he is entitled to Eleventh Amendment immunity as to the claims against him.

The language of Scruggs' complaint suggests that he understands that official capacity liability against a county sheriff cannot be predicated on a *respondeat superior* theory of liability.  Rather, § 1983 claims must be based upon the implementation or execution of "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  Monell v. Dep't Soc. Servs., 436 U.S. 658, 690, 98 S. Ct. 2018, 2036 (1978).  Thus, in order to prevail against Peterson in his official capacity, Scruggs is required to prove that the constitutional violations alleged by him "resulted from '(1) an action taken or policy made by an official responsible for making final policy in that area of the [Sheriff's] business; or (2) a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker.'"  Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir. 1995) (quoting Church v. City of Huntsville, 30 F.3d 1332, 1343 (11th Cir. 1994)).  Moreover, in addition to being required to prove that liability can be imposed on Sheriff Peterson as a result of a policy adopted by him, Scruggs must overcome the hurdle of Eleventh Amendment immunity flowing from the decision of the United States Court of Appeals for the Eleventh Circuit in Manders v. Lee, 338 F.3d 1304 (11th Cir. 2003).

In Manders, an inmate sued the county commissioners and the Sheriff of Clinch County

after he was allegedly beaten while in the jail.  In determining whether the Sheriff was entitled to summary judgment, the Eleventh Circuit considered whether a sheriff is an arm of the state for purposes of determining the sheriff's entitlement, in his official capacity, to immunity under the Eleventh Amendment to the Constitution of the United States.  If a sheriff is an arm of the state, he cannot be sued in his official capacity in federal court.  In making its determination in Manders, the Eleventh Circuit considered Georgia's governmental structure and concluded that a sheriff's office is separate and independent from the county in which it operates, and further concluded that deputy sheriffs, including deputy jailors, are employees of the sheriff and not the county.  Manders, 338 F.3d at 1308-12.  The court thus concluded that "only the State controls and grants powers and duties to sheriffs."  Id. at 1312.

In Manders, the court decided only "whether Sheriff Peterson is an 'arm of the state' in establishing force policy at the jail and in training and disciplining his deputies in that regard." Id. at 1319.  The court ultimately concluded that the sheriff was an arm of the state, not the county, "in establishing use-of-force policy at the jail and in training and disciplining his deputies in that regard," id. at 1328, and held that the sheriff was entitled to Eleventh Amendment immunity.  The court emphasized, however, that it was not deciding whether Georgia sheriffs "wear a 'state hat' for Eleventh Amendment purposes for all of the many specific duties assigned directly by the State."  Id. at 1319.  Rather, the court determined only whether Sheriff Peterson is an 'arm of the State' with respect to the force policy at the jail.

In this case, Scruggs has not brought a challenge to the use-of-force policies at the Clinch County jail.  Thus, the conclusion in Manders–that Sheriff Peterson was entitled to Eleventh

Amendment immunity–is not directly applicable to this case.  Nevertheless, in the Court's view, the same result obtains.

Scruggs contends that law enforcement officials violated his rights when they unlawfully seized him at the roadblock, subjected him to a search without a warrant or probable cause and then unlawfully arrested and detained him without due process of the law.  These allegations implicate Sheriff Peterson's policies concerning the execution of roadblocks, the use of canine units, and the arrest and booking procedures employed by his deputies at the scene and at the jail.  This Court finds that the establishment of policies regarding each of these activities were undertaken by the Sheriff in his capacity as an arm of the state.

In Manders, the Eleventh Circuit considered four factors to determine whether the sheriff was an arm of the state in carrying out his use-of-force policy:  "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity."  Id.  The court in Manders concluded that the first three factors weighed heavily in favor of a determination that the sheriff was acting as an arm of the state and, therefore, entitled to Eleventh Amendment immunity.  Id. at 1328.  The court found that the fourth factor did not defeat immunity.  Id. at 1329.

All of the factors considered by the Eleventh Circuit in Manders apply here with equal force, not only because the Eleventh Circuit was employing Georgia law but also because the sheriff's office under review in Manders was the same sheriff's office as is under review here, i.e., the Clinch County Sheriff's office.  Thus, this Court need only consider whether the same

9

result obtains where different sheriff's office policies are under review, in this case the use of roadblocks and canine units, as well as the implementation of searches, seizures, arrests, and detentions.

In <u>Manders</u>, the court outlined the duties assigned to sheriffs under Georgia law. Specifically, the court noted the sheriff is charged with the duty of enforcing the law; that those duties are derived from the State; and that counties cannot delegate any law enforcement powers to their county sheriffs. <u>Id.</u> at 1312-13.  The court also emphasized that State law imposes on sheriffs specific corrections duties and that "counties have no authority over what corrections duties sheriffs perform . . . or who is in charge of the inmates in the county jails." <u>Id.</u> at 1318.

While the decision in <u>Manders</u> does not conclusively compel this Court to find that Sheriff Peterson was acting as an arm of the state in implementing policies pertaining to roadblocks, canine units, searches, seizures, arrests, and detention, it appears to the Court that the policies at issue here flow from the powers granted to sheriffs under state law, rather than from any authority or control derived from Clinch County.  Beginning with the policies that led to the initiation of the roadblock and concluding with the policies that resulted in Scruggs' continued detention following his arrest, Sheriff Peterson was acting as an arm of the state. Accordingly, as to any claims against Sheriff Peterson in his official capacity stemming from these activities, he would be entitled to Eleventh Amendment immunity.

The Eleventh Amendment is a bar to suit by an individual against a state in a federal court. <u>Edelman v. Jordan</u>, 415 U.S. 651, 662-63, 94 S. Ct. 1347, 1355 (1974).  Even though the

state may not be named a party to the action, the suit may still be barred.  Id.  Having concluded that Sheriff Peterson is an arm of the State of Georgia, the Court also concludes that suit against him in this Court is barred by the Eleventh Amendment.  Therefore, all claims as to Sheriff Peterson in his official capacity are dismissed for want of jurisdiction.  *See* McLendon v. Ga. Dept. of Comm. Health, 261 F.3d 1252, 1256 (11th Cir. 2001) (stating federal courts lack jurisdiction to entertain claims that are barred by the Eleventh Amendment).

### 3.    Deputy Ferrell Howell, Official Capacity

Scruggs has sued Ferrell Howell in his individual capacity and in his official capacity as a Clinch County Deputy Sheriff.  The official capacity claims must be dismissed as barred by the Eleventh Amendment.

The Eleventh Circuit decided well before Manders that Alabama sheriffs' deputies enjoy the same immunities as Alabama sheriffs.  *See* Carr v. City of Florence, Ala., 916 F.2d 1521, 1526 (11th Cir. 1990). The court concluded that the actions of the deputy sheriffs were legally extensions of the sheriffs, so that the same immunities should extend to them.  Id.  *See also* Lancaster v. Monroe County, Ala., 116 F.3d 1419, 1429 (11th Cir. 1997) (holding that Alabama jailers are state officials entitled to Eleventh Amendment immunity when sued in their official capacities).

In Manders, the Eleventh Circuit noted that in Georgia deputies are employees of the sheriff and not the county.  Manders, 338 F.3d at 1311.  The court also noted that sheriffs, not counties, have responsibility for hiring and firing their deputies.  Id.  Thus, the same factors that led the Eleventh Circuit to conclude in Carr and Lancaster that jailers and sheriffs' deputies are

11

entitled to Eleventh Amendment immunity are present here.  Accordingly, the Court finds that Defendant Ferrell Howell is entitled to Eleventh Amendment immunity for those claims brought against him in his official capacity.  Therefore, all claims against Ferrell Howell in his official capacity are dismissed for want of jurisdiction.

### 4.    Raymond Earl Peterson

In his complaint, Scruggs alleges that while he was in jail, he demanded that Raymond Peterson take him before a judge, but that Peterson refused.  (Compl. ¶¶ 48-49.) Scruggs further alleges that Peterson's refusal to allow him to see a judge violated his rights under the Constitution of the United States and the laws of the State of Georgia.  (Compl. ¶ 55.) Peterson is sued in both his official and individual capacities.  For reasons discussed in preceding sections of this Order, Peterson is entitled to Eleventh Amendment immunity as to the official capacity claims against him and those claims are dismissed for want of jurisdiction. As discussed further below, Peterson is entitled to judgment as a matter of law as to the § 1983 claims against him in his individual capacity.

During discovery, Scruggs took the deposition of Raymond Peterson.  In the deposition, Peterson stated that he did not participate in the roadblock on November 26, 2003, and that he did not go to the Clinch County jail on that day.  (Peterson Dep. at 6-7.)  Peterson denied taking Scruggs' picture at the jail, but admitted taking his fingerprints.  (Peterson Dep. at 15.)  Peterson brought Linda Brown to the jail to see Scruggs on November 29, 2003, the day Scruggs was released.  (Peterson Dep. at 19.)  Peterson did not know Scruggs was in the jail until that time. (Peterson Dep. at 20.)  Peterson took Scruggs' fingerprints on November 29, 2003.  (Peterson

Dep. at 20.)

Peterson's testimony thus shows that he had no involvement with Scruggs' arrest and no contact with him until November 29, 2003, shortly before he was released.  Scruggs has offered no evidence that refutes Peterson's testimony as to his lack of involvement with Scruggs', either his arrest or detention.   In fact, other than noting Peterson's presence at the jail on November 29, 2003, Scruggs' concedes he does not know what Peterson's involvement was. (Scruggs' Dep. at 84.)

At the summary judgment stage, the moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" which would entitle the moving party to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotation marks omitted). If the moving party meets this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the nonmoving party is not entitled to a judgment as a matter of law.  Id. at 324-26.  This evidence must consist of more than mere conclusory allegations.  See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).  Under this scheme, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322, 106 S. Ct. at 2552.

13

With respect to Defendant Peterson, he has met his burden of demonstrating the absence of material facts as to his role in the claims at issue in this case. The burden thus shifts to Scruggs to go beyond the allegations of his complaint and present specific evidence showing that there are genuine issues of material fact as to Peterson's involvement in this case.

It is clear that Scruggs has failed to meet his burden of showing that there are genuine issues of material fact as to Peterson's involvement in the stop, or subsequent arrest of Scruggs, or his continued detention. The unrefuted evidence as to Peterson is that he had no contact with Scruggs until he brought Linda Brown to the jail to see him on November 29, 2003. Peterson's only other involvement with Scruggs was the act of fingerprinting him, which was also on November 29, 2003, about the time that Scruggs was released. In view of the absence of any evidence tending to show Peterson's involvement in the events which may have touched on Scruggs' federal rights, the Court finds Peterson is entitled to summary judgment as a matter of law as to the § 1983 claims brought against him in his individual capacity.

### 5.    Linda Brown

Linda Brown is sued individually and in her official capacity as a Magistrate Judge of Clinch County. (Compl. ¶ 14.) Scruggs alleges that Brown attempted to coerce him into signing a false statement when she came to see him at the jail on November 29, 2003, and then refused to release him even though no warrant had been issued against him. (Compl. ¶¶ 58-65.) Scruggs maintains that Brown's conduct served to deny him his due process rights. (Compl. ¶ 79.) Brown contends, among other things, that she is entitled to absolute immunity from any claims brought against her in her individual capacity.

14

"Judges are absolutely immune from civil liability under section 1983 for acts performed in their judicial capacity, provided such acts are not done in the 'clear absence of all jurisdiction.'" Roland v. Phillips, 19 F.3d 552, 555 (11th Cir. 1994) (quoting Stump v. Sparkman, 435 U.S. 349, 357, 98 S. Ct. 1099, 1105 (1978)). Judicial immunity does not apply in two circumstances: "(1) when the judge commits a nonjudicial act, or an act not taken in the judge's capacity, and (2) when the judge acts in a judicial capacity, but completely without jurisdiction." Robinson v. Becker, 595 S.E.2d 319, 321 (Ga. Ct. App. 2004). Scruggs contends that the actions taken by Brown, and which form the basis for his complaint against her, were taken without jurisdiction. This Court need not address the immunity question, however, because the Court finds that the evidence fails to establish wrongful conduct by Brown touching on Scruggs' federal rights.

In his deposition, Scruggs testified that on November 29, 2003, Brown came to see him at the jail. He told her at that time that he had been trying to see a judge for three days. He contends Brown responded by saying, "We don't do things that way around here." (Scruggs Dep. at 81-82.) Scruggs also testified that Brown never held any hearing and never asked him any questions but, instead, presented him with a "First Appearance on Arrest Warrant" form, which she directed him to sign. (Scruggs Dep. at 83.) Scruggs refused to sign the form because it contained two inaccuracies: it indicated that he had been arrested with a warrant, which was not correct, and it stated that a hearing had been held within 48 hours, which was not correct.

According to Scruggs' testimony, afer he refused to sign the form, Brown left him and went to talk to Deputy Lee. (Scruggs Dep. at 84.) Deputy Peterson and another, unidentified,

15

officer were also present.  (Scruggs Dep. at 84.)  Brown then returned to Scruggs, asked him

if he would sign the form if she scratched out a line on it, and he said that he would.  (Scruggs

Dep. at 84.)  Brown then scratched out the statement on the form that said "I certify that this

hearing was held within 48 hours of a warrantless arrest."  (Scruggs Dep. at 87.)  Scruggs then

agreed to sign the form, which he did after Brown scratched out the disputed language.

(Scruggs Dep. at 84.)  Scruggs then agreed to provide booking information to the Sheriff's

Deputies.  (Scruggs Dep. at 84-85.)  The entire encounter with Brown took approximately 20

minutes.  (Scruggs Dep. at 84.)  Scruggs left the jail around midnight of the same day.  (Scruggs

Dep. at 87.)

     In reviewing the evidence as it pertains to Defendant Brown, the Court finds that it is

insufficient to create a jury question on the issue of whether she violated Scruggs' federal rights.

There is no evidence to suggest that Brown knew that Scruggs was in jail or that she was asked

to come to the jail and refused.  To the contrary, the evidence suggests that the procedures at

the jail did not require the presence of a magistrate judge, and thus none was sought by the

deputies.  Scruggs was charged with marijuana possession, a misdemeanor offense for which

bond was preset by the magistrate judge's office.  Thus, it was not necessary for a magistrate

judge to be involved in order for Scruggs to obtain his release.  (Brown Dep. at 24.)  The

evidence shows that Brown's only involvement with the case occurred on November 29, 2003,

after she was contacted by Deputy Lee and asked to come out to the jail to see Scruggs.  (Brown

Dep. at 24.)

     With respect to the evidence as to Brown's conduct at the jail, it is also insufficient to

create a triable issue as to whether Brown violated Scruggs' federal rights.  There is no evidence of coercion or undue influence by Brown.  According to Scruggs' own testimony she asked him to sign the form, he refused.  She then asked him if he would sign it if she scratched out certain portions; he agreed.  He then signed the edited form, provided the information requested by the Sheriff's Deputies, and then bonded out later in the day.  Nothing about the sequence of events suggests that Brown's conduct toward Scruggs was improper in any way.

Scruggs does say in his deposition testimony that by the time he saw Brown on November 29, 2003, he had endured a power outage at the jail that frightened him, been in a solitary cell, and eaten little food.  (Scruggs Dep. at 85.)  Scruggs contends, therefore, that by the time he saw Brown he was acting under duress.  (Scruggs Dep. at 85.)  However, nothing offered by Scruggs suggests that Brown contributed to these circumstances, or even knew about them during her dealings with him.  Therefore, to the extent that Scruggs contends he was acting under duress in his dealings with Brown, these contentions are insufficient to impose liability on Brown.  Accordingly, Brown is entitled to summary judgment as to the § 1983 claims brought against her in her individual capacity.

In addition to alleging claims against Brown in her individual capacity, Scruggs seeks to bring claims against Brown in her official capacity as a Magistrate Judge of Clinch County.  (Comp. ¶ 14.)  An official capacity suit is in all respects a suit against the entity that the individual represents.  *See, e.g.*, Brandon v. Holt, 469 U.S. 464, 471-72, 105 S. Ct. 873, 878 (1985).  As discussed in the section that follows, it is not clear whether Brown was functioning as a state actor or a county actor during the events in question in this suit.  Regardless, there can

be no official capacity liability for her actions.

An inquiry into the governmental agency's liability is only relevant when a constitutional deprivation has occurred.  Rooney v. Watson, 101 F.3d 1378, 1381 (11th Cir. 1996).  Having determined that Brown's conduct did not cause Scruggs to suffer a constitutional deprivation, there is no need to inquire into any official liability for her acts.  Brown is therefore entitled to summary judgment as to the § 1983 claims brought against her in her individual and official capacity claims.

### 6.    Annie Ruth Steedley

Scruggs has sued Annie Ruth Steedley in her official capacity as Chief Magistrate Judge of Clinch County.[9]  (Compl. ¶ 15.)  Specifically, as to Steedley, Scruggs alleges that she is liable because she failed to train and supervise Brown.  (Scruggs Dep. at 66.)  Steedley contends that she is a state actor entitled to the protections of the Eleventh Amendment.

As the earlier discussion concerning Sheriff Peterson illustrates, a determination as to whether an official is a state actor must be made after weighing various factors related to the particular functions at issue.  Specifically, the Eleventh Circuit  has directed courts to look at four factors:  "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity."  Manders, 338 F.3d at 1309.  With respect to Sheriff Peterson,

---

[9] The complaint refers to Steedley as the Chief Magistrate but then says "Brown is being sued in her official capacity."  (Compl. ¶ 15.)  In the previous paragraph, Scruggs stated, "Brown is being sued in her official and individual capacity."  (Compl. ¶ 14.)  In spite of the small misstatement in paragraph 15, it is clear from the context of the complaint that Scruggs is attempting to sue Steedley in her official capacity and Brown in her official and individual capacities.

those factors had already been addressed by the Eleventh Circuit in <u>Manders</u>.  As to Steedley, however, there is very little in the record from which this Court can determine whether she was functioning as an arm of the State or as an arm of the County with respect to her duties of supervising and training Brown.

It is clear that the State of Georgia exercises substantial control over magistrate judges. The Constitution of the State of Georgia states as follows:  "The judicial power of the state shall be vested exclusively in the following classes of courts:  magistrate courts, probate courts, juvenile courts, state courts, superior courts, Court of Appeals and Supreme Court."  Ga. Const. art. VI, § 1, ¶ 1.  Furthermore, magistrate judges are subject to "discipline, removal, and involuntary retirement by the Judicial Qualifications Commission."  O.C.G.A. § 15-10-24 (LexisNexis 2005).  It thus appears that state law defines the magistrate courts as state entities and that the State maintains a large degree of control over them.  Nevertheless, there is nothing in the record from which this Court can determine from where the magistrate judge derives its funds or what entity is responsible for a judgment against the office.  Therefore, the Court is unable to determine based on the record before it whether Judge Steedley was acting as an arm of the state with respect to the functions at issue in this case.

While not able to determine whether Judge Steedley, in her official capacity, functions as an arm of the state, the Court nevertheless concludes that she is entitled to summary judgment.  Scruggs acknowledges that his claim against Steedley is based on her failure to train and supervise Brown.  However, this Court has determined that the evidence is insufficient to create a jury question on the issue of whether Brown's conduct served to violate Scruggs'

federal constitutional or statutory rights.  As a result, Scruggs cannot maintain his claim against Steedley.

Local governments can be subject to § 1983 liability if training, supervision, or scrutiny in hiring is so inadequate as to demonstrate "deliberate indifference to the rights of persons with whom the [state actors] come into contact."  City of Canton v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 1204 (1989).  Because liability under a failure to train theory is part of a policy or custom analysis, a plaintiff must prove that an underlying constitutional violation occurred and that the failure to train was the "'moving force [behind] the constitutional violation.'"  Id. at 389, 109 S. Ct. at 1205 (quoting Monell, 436 U.S. at 694, 98 S. Ct. at 2037).  This Court's conclusions in the preceding section–that the conduct of Brown did not serve to violate a constitutional right–forecloses any claim for liability against Steedley as her supervisor.  As the Supreme Court of the United States has noted, a plaintiff has no right to recover against a governmental entity when there has been a determination that no constitutional injury has been inflicted:  "If a person has suffered no constitutional injury at the hands of the [individual defendants], the fact that the departmental regulations might have *authorized* the [offensive conduct] is quite beside the point."  City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S. Ct. 1571, 1573 (1986); *see also* Rooney, 101 F.3d at 1381.  Thus, if there is no injury that rises to the level of a constitutional injury, there can be no liability under § 1983.  Accordingly, the § 1983 claims against Steedley in her official capacity must fail.

7.     **James Greene**[10]

James Greene is sued in his individual capacity as a result of his participation in the roadblock that led to Scruggs' arrest   Specifically, Scruggs alleges that as a result of the actions of Greene and others, his Fourth Amendment rights were violated when he was subjected to an unreasonable search and seizure as a result of the roadblock.  (Compl. ¶ 74.) Scruggs does not contend that his arrest was wrongful.  He concedes that once marijuana was found in a car that he was driving, there was probable cause to arrest him.  (Scruggs Dep. at 43-44.)  Instead, Scruggs challenges the lawfulness of the roadblock that resulted in the stop and subsequent search of his vehicle.  (Scruggs Dep. at 44.)

In Delaware v. Prouse, 440 U.S. 648, 99 S. Ct. 1391 (1979), the Supreme Court of the United States held that a stop of a single vehicle by a police officer for the sole purpose of checking the driver's license and registration was unreasonable under the Fourth Amendment. Id. at 663, 99 S. Ct. at 1401.  In reaching its result, however, the Court noted that "the States have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed."  Id. at 658, 99 S. Ct. at 1398.  The Court suggested that "[q]uestioning of all oncoming traffic at roadblock-type stops is one possible

_____

[10] According to his deposition testimony, on November 26, 2003, Greene was working for the Georgia Department of Corrections. (Greene Dep. at 9.) He participated in the roadblock at the request of Allen Lee. (Greene Dep. at 14.)  He arrived at the roadblock separately, with his canine unit. (Greene Dep. at 16.)  Greene was one of the people on the scene who searched Scruggs' car. (Greene Dep. at 21.)  Greene walked his dog around Scruggs' vehicle. (Greene Dep. at 28.)  The dog alerted on the driver's side and the passenger's side of the vehicle.  (Greene Dep. at 28.)  Greene was not involved with Scruggs once he was taken to the jail.  (Greene Dep. at 29-30.)

alternative" to the more intrusive spot check at issue in <u>Prouse</u>.  <u>Id.</u> at 663, 99 S. Ct. at 1401.

In <u>City of Indianapolis v. Edmond</u>, 531 U.S. 32, 121 S. Ct. 447 (2000), the Supreme Court revisited the issue of highway roadblocks and concluded that highway checkpoints set up solely for the purpose of detecting evidence of criminal wrongdoing violate the Fourth Amendment.  <u>Id.</u> at 48, 121 S. Ct. at 457-58.  In <u>Edmond</u>, the Court noted that under its earlier holding in <u>Prouse</u>, "a similar type of roadblock with the purpose of verifying drivers' licenses and vehicle registrations would be permissible."  <u>Id.</u> at 37-38, 121 S. Ct. at 452.

Relying on the language of the Court in <u>Prouse</u> and <u>Edmond</u>, other courts have concluded that drivers' license checkpoints do not violate the Fourth Amendment.  In an unpublished opinion, the United States Court of Appeals for the Fourth Circuit held that a roadblock that stopped each vehicle to check for drivers' licenses and did not involve discretionary behavior on the part of the police officers was reasonable.  <u>United States v. Price</u>, no. 05-4426, 2006 WL 228626, at *2 (4th Cir. Jan. 31, 2006).  This Court concurs with the conclusion of the Fourth Circuit in <u>Price</u> that the decisions in <u>Prouse</u> and <u>Edmond</u> authorize law enforcement to set up roadblocks on highways for the purpose of checking drivers' licenses and vehicle registration, so long as the officers involved do not act with "'standardless and unconstrained discretion.'"  <u>Edmond</u>, 531 U.S. at 39, 121 S. Ct. at 453 (quoting <u>Prouse</u>, 440 U.S. at 661, 99 S. Ct. at 1400).  Similarly, a highway roadblock established for the express purpose of checking to see if motorists and their passengers are wearing seatbelts would be proper.

Plaintiff suggests that in this case, however, the creation of the roadblock was merely

22

subterfuge and that the real purpose of the roadblock was to create an opportunity for law enforcement to conduct generalized searches for illegal drugs.  (Pl.'s Resp. at 5, stating, "Belying this assertion is the fact that there were more drug dogs from a distant jurisdiction than there were sheriff's deputies from Clinch County.")  Courts from other jurisdictions have held that where the evidence would support a finding that the actual primary purpose of a roadblock is an unlawful one, a Fourth Amendment violation may occur, even though the roadblock may be lawful for other purposes.  Thus, in Collins v. Ainsworth, 382 F.3d 529, 544 (5th Cir. 2004), the Court held that evidence in the record tending to show that the purpose of the roadblock was to prevent the occurrence of a concert was sufficient to prevent summary judgment as to the plaintiffs' Fourth Amendment claims.  *See also* United States v. Davis, 270 F.3d 977, 158 (D.C. Cir. 2001) (directing district court to determine primary purpose of roadblock in order to determine its legitimacy).

     In discussing the subjective intent of the officers conducting a challenged roadblock, the Supreme Court reaffirmed that the constitutional reasonableness of traffic stops is not determined by the actual motivations of the individual officers involved.  Edmond, 531 U.S. at 45, 121 S. Ct. at 456.  The Court noted that such subjective intentions are irrelevant to the validity of a stop that is justified by probable cause to believe that a traffic violation has occurred.  Id.  The Court pointed out, however, that searches which occur "pursuant to a general scheme absent individualized suspicion" may require inquiry into purpose.  Id. at 46, 121 S. Ct. at 456-57.  The Court added, "[A] program driven by an impermissible purpose may be proscribed while a program impelled by licit purposes is permitted, even though the challenged

conduct may be outwardly similar." Id. at 46-47, 121 S. Ct. at 457.

As the foregoing cases and language from Edmond suggests, in the case of intrusions that occur pursuant to a general scheme, and absent individualized suspicion, courts are obligated to look beyond the stated purpose of the program and to ascertain the primary purpose. Therefore, the Court will address the evidence insofar as it concerns the purpose of the roadblock.

Scruggs took the depositions of Deputy Ferrell Howell, Sheriff Winston Peterson, Officer Bass, and Officer Greene. When asked about the purpose of the roadblock, each stated that the roadblock was set up to coincide with the "Click It or Ticket" operation that was ongoing at the time and each confirmed that its primary purpose was to check for seat belt violations.[11] (Howell Dep. at 7-8; W. Peterson Dep. at 20; Bass Dep. at 20; Greene Dep. at 18-19.) Each witness also conceded, however, that while checking for seat belt violations, they were looking for other violations, including the use of illegal drugs. (Howell Dep. at 8; W. Peterson Dep. at 20; Bass Dep. at 20; Greene Dep. at 18-19, 25.)

In addition to testimony concerning the purpose of the roadblock, there was testimony concerning the procedures followed. Specifically, the witnesses testified that they stopped each car that approached the intersection where the roadblock was set up. (Bass Dep. at 20-21; Greene Dep. at 19.) Not every car that was stopped was asked to pull over to the side of the road, but it was normal procedure to ask those drivers to pull over that were having trouble

_____

[11] Some of the witnesses referred to it as operation "Strap and Snap." (E.g., Dep. W. Peterson at 20.)

finding the requested paperwork.  (Howell Dep. at 24.)  Once a car had been pulled over to the side, it was also normal procedure to walk a drug dog around the car.  (Howell Dep. at 10; Bass Dep. at 21.)  The officers denied walking the dogs around every car and denied walking the dogs around vehicles in traffic, maintaining that the dogs were walked around the cars only after the cars were pulled over.  (Howell Dep. at 10; Bass Dep. at 21.)

With respect to the roadblock in place on November 26, 2003, the testimony showed that it was put in place at the request of the governor's office–the Governor's Safety Counsel. (Howell Dep. at 7; W. Peterson Dep. at 17.)  After agreeing to set up the roadblock, the Clinch County Sheriff's Office arranged for Clinch County Sheriff's Deputies and Department of Corrections (DOC) and Department of Natural Resources (DNR) officers to work the roadblock.  Three DOC officers worked the roadblock; each had a canine unit with him.  (Bass. Dep. at 14-15; Greene Dep. at 16.)  At times during the roadblock there were as many as seven law enforcement officers present, but the usual number at the scene was four or five.  (Resp. Def. Howell to Pl.'s 1st Interrogs. No. 7.)

Scruggs relies on the number of canine units present as well as his claim that a drug dog was presented at his car before he even had a chance to provide his driver's license to support his claim that the primary purpose of the roadblock was to detect evidence of criminal wrongdoing.  However, even accepting these allegations as true, the Court finds that they are insufficient to create a jury issue on the question of whether the primary purpose of the roadblock was legitimate, i.e., for the purpose of promoting safety on the highways, or not legitimate, i.e, for the purpose of detecting evidence of criminal wrongdoing.  Each of the

25

officers deposed stated that the primary purpose of the roadblock was to check for seat belt violations.  Although each also added that he was also checking for other evidence of illegal activity, this adds nothing to the equation–an on-duty police officer is *always* checking for evidence of illegal activity.  Moreover the presence of three police dogs, one of which may have been brought to the car before Scruggs produced his license is insufficient to show that the primary purpose was to obtain evidence of general criminal wrongdoing.  Therefore, the Court finds that the stop of Scruggs' vehicle was not unlawful but was made pursuant to a valid highway roadblock.

Because Scruggs concedes that his arrest was lawful, and challenges only the legitimacy of the stop, the remaining events as to which Greene was a participant–the search of the vehicle following the dog's alert and subsequent arrest–are not at issue here.  Scruggs' remaining challenges pertain to the lawfulness of his detention at the jail following his arrest, and relate to events as to which Greene had no involvement.  As to Greene, therefore, there are no other § 1983 claims remaining.  He is entitled to summary judgment as a matter of law as to the § 1983 claims against him in his individual capacity.

### 8.    Ferrell Howell, Individual Capacity

Ferrell Howell, who was working as a Clinch County Sheriff's Deputy during the events in question, is sued in his individual and his official capacity.  As previously discussed, as to those claims brought against him in his official capacity, he is entitled to Eleventh Amendment immunity and those claims are barred from suit in this Court.

As to the claims brought against Howell in his individual capacity, they arise from the

26

events giving rise to Scruggs' stop and arrest at the roadblock and the detention of Scruggs at the jail following his arrest.  As to the events giving rise to Scruggs' stop and arrest at the roadblock, the same result obtains for Howell as for Greene:  Scruggs has failed to demonstrate that the evidence is sufficient to create a fact dispute as to the primary purpose of the roadblock. Therefore, as to any § 1983 claims brought against him as a result of the stop and search of Scruggs' vehicle, Howell is entitled to judgment as a matter of law.  As to the detention of Scruggs at the jail, the Court's findings and conclusions are set forth below.

After Scruggs was arrested at the roadblock, Howell transported him to the Clinch County Jail on November 26, 2003, at approximately 4:00 p.m.  (Howell Dep. at 11 & Ex. 2.) Once at the jail, Howell attempted to obtain information from Scruggs but Scruggs refused to provide any information to Howell.  (Howell Dep. at 21-22.)

According to Howell, the usual procedure where there has been an arrest is to fill out an arrest and booking form.  (Howell Dep. at 11-12.)  If the arrest is for a misdemeanor offense, the procedure is to fill out the arrest and booking form, then let the offender sign a property bond or put up a cash bond.  (Howell Dep. at 12.)  If the arrest is for a felony offense, the issue is presented to a magistrate judge, who then decides whether to issue a felony warrant.  (Howell Dep. at 12.)  In this case, Howell had been told by Lee to charge Scruggs with misdemeanor possession of marijuana.  (Howell Dep. at 13.)  Howell heard Scruggs' request to be taken before a judge but never insisted that he be seen by a judge.  (Howell Dep. at 14.)

Because Scruggs refused to provide his name and other information, Howell was unable to complete an arrest and booking form on him.  (Howell Dep. at 21.)  Under the usual practice,

a citation would have been written out and a bond obtained and the party would be released within a few hours.  (Howell Dep. at 21.)  Instead, Howell put Scruggs in a holding cell. (Howell Dep. at 21.)  When Deputy Lee arrived at the jail, Howell told him that Scruggs refused to answer any questions.  (Howell Dep. at 22.)  Howell had no further contact with Scruggs after Lee arrived at the jail.  (Howell Dep. at 22, 26.)

In arguing that the actions of Howell, and others, violated his rights, Scruggs relies on O.C.G.A. § 17-4-62, which provides:

> In every case of an arrest without a warrant, the person arresting shall, without delay, convey the offender before the most convenient judicial officer authorized to receive an affidavit and issue a warrant as provided for in Code Section 17-4-40.  No such imprisonment shall be legal beyond a reasonable time allowed for this purpose; and any person who is not brought before such judicial officer within 48 hours of arrest shall be released.

O.C.G.A. § 17-4-62 (LexisNexis 2004). At least one district court construing § 17-4-62 in conjunction with relevant Supreme Court of the United States authority has concluded that the failure to bring the arrested person before a judicial officer within 48 hours of the arrest violates the Fourth Amendment.  *See, e.g.,* Young v. Graham, No. 304-066, 2005 WL 2237634, at *3 (S.D. Ga. Aug. 11, 2005) (holding that detention of arrestee in excess of 48 hours without seeking warrant was presumptively in violation of Fourth Amendment).

In Gerstein v. Pugh, 420 U.S. 103, 114, 95 S. Ct. 854, 863 (1975), the Supreme Court held that the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention following a warrantless arrest.  The decision in Gerstein left it to the states to establish their own procedures for making prompt probable cause

determinations following arrests without warrants.  Id. at 123-25, 95 S. Ct. at 868-69.  In County of Riverside v. McLaughlin, 500 U.S. 44, 111 S. Ct. 1661 (1991), the Court decided that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of Gerstein."  Id. at 56, 111 S. Ct. at 1670.  It is undisputed that Scruggs did not receive a probable cause determination within 48 hours of his arrest, as required by the Supreme Court in McLaughlin.

While acknowledging that Scruggs did not receive a probable cause determination within 48 hours of his arrest, Defendants contend that the 48-hour rule does not apply in these circumstances because Scruggs was never "booked."  They maintain that the 48-hour period runs from the time of booking.  For this contention, they rely on the following language from McLaughlin:

> Everyone agrees that the police should make every attempt to minimize the time a presumptively innocent individual spends in jail.  One way to do so is to provide a judicial determination of probable cause immediately upon completing the administrative steps incident to arrest–*i.e.,* as soon as the suspect has been booked, photographed, and fingerprinted.

McLaughlin, 500 U.S. at 58, 111 S. Ct. at 1670-71.  Defendants also rely on a decision from the United States District Court for the Northern District of Georgia, involving the same Plaintiff, in which the District Court reached a similar result on similar facts.  Scruggs v. Sparks, No. 1:99-cv-2565-BBM (N.D. Ga. Dec. 8, 2005) (holding that because Scruggs refused to comply with the Henry County, Georgia, booking procedures, the 48-hour rule of McLaughlin did not apply).

This Court need not determine whether Scruggs' rights were violated as a result of a

failure to bring him before a judicial officer for a probable cause determination within 48 hours of his arrest.  The only Defendant in this case against whom claims remain is Ferrell Howell. It is undisputed that Howell was not the officer who made the arrest of Scruggs.  It is also undisputed that Howell had no contact with Scruggs after he transported him to the jail on November 26, 2003, and was unable to complete the booking process.  The evidence shows that Howell turned the case over to Lee when Lee arrived at the jail on November 26, 2003, and had no further contact with him.

Scruggs has offered nothing to the Court to show that Howell, who was not the arresting officer, and had no contact with Scruggs after leaving him at the jail at the request of the arresting officer, had a duty to follow up with Scruggs within 48 hours to ensure that he had been brought before a judicial officer.  Moreover, the law and the evidence suggest otherwise. O.C.G.A. § 17-4-62 states that "the person arresting" shall convey the offender before a judicial officer.  The deposition testimony further suggests that in Clinch County the responsibility for ensuring that detainees are brought before a magistrate judge lies with the arresting officer.  (W. Peterson Dep. at 31-32; Allen Dep. at 10.)  In the absence of any showing by Scruggs that Howell, as opposed to Lee, had a duty to bring him before the magistrate judge, Howell is entitled to judgment as a matter of law as to the claims brought against him in his individual capacity.

In summary, as to the claims against Howell, he is entitled to Eleventh Amendment immunity as to the claims brought against him in his official capacity and those claims are dismissed.  Howell is entitled to summary judgment as to the § 1983 claims brought against him

30

in his individual capacity.

## B.    REMAINING FEDERAL CLAIMS

In addition to alleging claims under § 1983, Scruggs has alleged claims under 42 U.S.C.A. § 1985, 1986, and 1988.  Each of those claims are discussed below.

### 1.    Section 1985

Scruggs vaguely alleges Defendants conspired to violate his rights, thereby giving rise to a cause of action under 42 U.S.C.A. § 1985.[12]  The Supreme Court has identified the elements of a § 1985(3) claim as "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States."  United Bhd. of Carpenters & Joiners of Am. v. Scott, 463 U.S. 825, 828-29, 103 S. Ct. 3352, 3356 (1983).  Furthermore, in order to maintain a claim under § 1985(3), Scruggs must show that Defendants were motivated by racial or class-based "invidiously discriminatory animus."  Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S. Ct. 1790, 1798 (1971).  See also Burrell v. Board of Trustees of Ga. Mil. C., 970 F.2d 785, 793-94 (11th Cir. 1992) (stating elements of a claim and noting that the intent requirement of § 1985(3) "erects a significant hurdle for . . . plaintiffs").

---

[12] 42 U.S.C.A. § 1985 has three subparts:  (1) Preventing officer from performing duties; (2) Obstructing justice; intimidating party, witness, or juror; and (3) Depriving persons of rights or privileges."  42 U.S.C.A. § 1985 (West 2003).  The Court presumes that Scruggs' claims are made pursuant to 42 U.S.C.A. § 1985(3).

In this case, Scruggs has come forward with no evidence which would suggest that a fact question exists as to whether Defendants' acts were motivated by racial or class-based "invidiously discriminatory animus." Nothing in the record even suggests that Defendants' actions were conspiratorial. In the absence of any evidence to the contrary, Defendants are entitled to summary judgment with respect to Scruggs' § 1985 claims.

### 2.      Section 1986

In addition to alleging claims under §§ 1983 and 1985, Scruggs alleges claims under 42 U.S.C.A. § 1986. "Section 1986 imposes liability on every person who knows of an impending violation of section 1985 but neglects or refuses to prevent the violation." Karim-Panahi v. Los Angeles Police Dept., 839 F.2d 621, 626 (9th Cir. 1988). Because Scruggs' § 1985 claim fails, his claims brought pursuant to 42 U.S.C. § 1986 must also fail. Section 1986 is intended to punish those who aid and abet violations of § 1985. Therefore, where, as here, no violation of § 1985 can be maintained, there can be no violation of § 1986. Haverstick Enter. v. Fin. Fed. Credit, Inc., 32 F.3d 989, 994 (6th Cir. 1994).

### 3.      Section 1988

Scruggs maintains that his action is brought pursuant to 42 U.S.C.A. § 1988. 42 U.S.C.A. § 1988 allows a prevailing party in certain identified civil rights actions to recover attorney's fees as part of the costs of the litigation. 42 U.S.C.A. § 1988(b) (West 2003). It necessarily follows, however, that where, as here, a plaintiff's civil rights actions have been decided adversely to him on summary judgment, such plaintiff cannot be a "prevailing party." Moreover, it is well settled that a pro se litigant who is not a lawyer is not entitled to attorney's

fees.  *See* Kay v. Ehrler, 499 U.S. 432, 111 S. Ct. 1435 (1991).  Therefore, Defendants are entitled to summary judgment with respect to Scruggs' claims under § 1988.

### C.     STATE LAW CLAIMS

Scruggs contends that the actions of the Defendants violated his rights under the Constitution and the laws of the State of Georgia.  Given that the Court has granted summary judgment to Defendants on Scruggs' federal claims,  the provisions of 28 U.S.C.A. § 1367(c) would apply:  "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection(a)[13] if–(3) the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C.A. § 1367(c) (West 1993).  *See also* Baggett v. First Nat'l Bank of Gainesville, 117 F.3d 1342 (11th Cir. 1997) (discussing when district court should decline jurisdiction).   In accordance with § 1367(c), therefore, this Court declines to exercise supplemental jurisdiction over Scruggs' state law claims and the same are hereby dismissed without prejudice.

### III.    CONCLUSION

In view of all of the foregoing, the Motion for Summary Judgment by Defendants Linda Brown, Annie Ruth Steedley, Winston Peterson, Ferrell Howell and Clinch County, Georgia [doc 29] is granted as more specifically set forth below.  Defendant James Greene's Motion for Summary Judgment [doc 38] is granted as more specifically set forth below.  Plaintiff's Motion

---

[13] Subsection (a) provides, in part, as follows:  "Except as provided in subsections (b) and (c) . . . in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other such claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ."  28 U.S.C.A § 1367(a) (West 1993).

for Summary Judgment [doc 65] is denied.  The Court directs as follows:

1.  Allen Lee is dismissed as a Defendant.

2.  John Doe is dismissed as a Defendant.

3.  Summary judgment is granted to Clinch County, Georgia, and the Clinch County Commissioners, Defendants Strickland, Hart, Corbett, Cross-Scott, and Smith, as to all federal claims against them.

4.  All claims against Defendants Winston Peterson, Ferrell Howell, and Raymond Peterson in their official capacities are dismissed as barred by the Eleventh Amendment.

5.  Summary judgment is granted to Raymond Peterson as to the federal claims against him in his individual capacity.

6.  Summary judgment is granted to Linda Brown as to the federal claims against her in her individual and official capacities.

7.  Summary judgment is granted to Annie Ruth Steedley as to the federal claims against her in official capacity.

8.  Summary judgment is granted to James Greene as to the federal claims against him in his official capacity.

9.  Summary judgment is granted to Ferrell Howell as to the federal claims against him in his individual capacity.

10.  All state law claims are dismissed without prejudice.

There being no further claims remaining, let judgment be entered accordingly

**SO ORDERED**, this the 30th day of September, 2006.

34

/s/Hugh Lawson
**HUGH LAWSON, JUDGE**

mls